This Honorable Court is reconvening. Please be seated. For the record, Justices Thomas and Justice Hudson will not be in attendance for the oral arguments here. Harris. Harris. Harris. Did I say Harris? You said Thomas. Excuse me. Tom Harris. We'll not be here for the following three cases. All your oral arguments are recorded, and there will be fully participating members of this court in rendering a decision, and they will have the full benefit of your arguments through recording. They have prior judicial commitments that they have to be at this morning. So with that announcement, please call the next case. 416-0192, Annette Schroeder v. Workers' Compensation Commission. Counsel, you may proceed. Thank you. May it please the Court, Mr. Coleman. Good morning, Justices. My name is Steve Smalling. I am the attorney for Annette Schroeder, and I am here this morning asking this court to overturn the decision of the Circuit Court of McLean County and confirm the decision of the Workers' Compensation Commission previously entered herein. I had the privilege a couple of years ago of appearing before this panel where I represented a claimant, Walter Matuszak, against Walmart. I think the case was alluded to earlier. And in that case, obviously some issues were different. But as I was preparing for that argument and the brief filed before this court, I kept coming to the conclusion in my head, this case has already been decided by interstate scaffolding. And that's ultimately how that Matuszak case came out. As I was preparing for the briefs and arguments before this court today, it's like deja vu all over again in my mind, and I could be wrong. I bet you Mr. Coleman will point out why. But I think this case was literally decided by Justice Harris's decision in Corn Belt. I think the facts, the legal issues raised by the employer in that case, and the conclusions, which I would ask this court to find, were decided in that case. As in Corn Belt, we're here today with a situation involving an employee with a pre-existing condition which nobody disputes. There was an accident, which is undisputed in this case, as in Corn Belt. Subsequent treatment, and then issues arose as to whether or not there was sufficient evidence to establish causal connection under the law. The employer in Corn Belt, as was done here by Swift Transportation before the circuit court, argued two things. The commission got it wrong as a matter of law, and their decision was against the manifest weight of the evidence. In the commission decision herein, as in Corn Belt, the commission utilized the chain of events theory to establish or to confer that there was sufficient circumstantial evidence to show causal connection. The employer herein, as in Corn Belt, said you can't use that analysis. You can't use that theory in a situation where there is a claimant with a pre-existing condition. Counsel, that's not their best argument. I understand. That's going nowhere. Okay. It's a baseline. Whatever that condition was, whatever the condition may have been prior to the accident, is the thing you compare it to, even though it may very well be a condition where he suffers from some type of an injury. Yes, sir. It's not a very good argument, so don't spend a lot of time on it. The reason I raise it, Your Honor, is that if there's an allegation that the commission errors a matter of law, we're looking at de novo. I submit to this honorable court it's a math that's way standard, which it was up to the commission to weigh the evidence. In the Corn Belt case, the employer argued that the petitioner in that case had significant pre-existing conditions involving the same area of the body, involving the same modes of treatment. In this case, the employer is saying we've got significant pre-existing conditions involving the same area of the body and involving the same modes of treatment. The next question, though, is that's not the end of the inquiry. Rather, did the accident aggravate or accelerate the condition? It's a black letter of workers' comp law that if there's an aggravation of a pre-existing condition, it's compensable under the act. In Corn Belt, we had chiro treatment for years, up to about a month before the accident, and then a resumption of chiro treatment. I think that's the one distinguishing factor between Ms. Schroeder's claim and the Corn Belt claimant. Ms. Schroeder had a bad back. She went to see the doctor in March of 2013. The doctor said, let's do some x-rays and maybe we'll figure out if we're going to do a surgery. That surgery was never scheduled. It was never performed. What did happen was Ms. Schroeder then went, got recertified to be a truck driver, passed a DOT physical, passed a physical that was required of her by the respondent, Swift Transportation. At that time, she was not under any limitations or restrictions which impacted on her ability to be a truck driver. In May of 2013, she started driving a truck. Ms. Schroeder didn't drive a box truck between towns or around town. Ms. Schroeder got in a semi and lived in the semi for the next seven months. I'm not saying that figuratively. She lived in the semi. She drove six days a week, eight to 11 hours a day. Swift gave her whatever breaks, hour, year, 15-minute breaks. She performed those job duties without incident for the next seven months. Swift produced no witnesses who testified at arbitration that Ms. Schroeder's back condition in any way impacted on her ability to perform those job duties. On the date of December 19, 2013, she drives to a Walmart in Sterling, Illinois, I believe, falls on ice, injures her back. She immediately ends up in the emergency room. She's got complaints to her elbow head but also her low back. The employer says, okay, stay there until we can get the truck taken care of and then come home, which she did. She then goes and sees Dr. Yazback, her neurosurgeon, who you saw before. Now, going back to Kornbelt, one of the key things that this court looked at was we knew we had Cairo before and we've got Cairo afterwards. But this court found that there was sufficient medical evidence to establish that the commission got it right because, one, the Cairo visits increased. Number two, the claimant had different symptoms. And number three, the doctor, chiropractor himself, documented deterioration of the condition. So what do we have here in this case? Well, we've got a woman who for seven months could be an over-the-road truck driver, 18-wheeler. Dr. Yazback testified, but for that accident of December 19, 2013, it's conceivable she could have kept driving the truck. There's no evidence she would have had to have a surgery. But instead, here's what we know. She ends up in the emergency room. They prescribe hydrocodone. They take her off of work. She gets in to see Yazback as soon as she can. And what's he do? Well, he keeps her off of work. He prescribes a TENS unit. He prescribes therapy. He prescribes work, physical work, conditioning, I believe. And it was his hope to get her back to that baseline that Justice Hoffman alluded to before, back here in June, July, August, September, October, November, December 1 through 12, when she was able to get in that truck and drive from here to Arizona, Washington, Minnesota, New York, and back here. Instead, we've got Ms. Schroeder, who's back up in Wisconsin taking narcotic pain medication. She can't sleep for more than an hour at a time. She can't sit or stand more than 15 minutes at a time. I believe they did some injections. Four months later, Dr. Yazback says, enough's enough. We need to do the surgery. And they did it. I believe, under the Manifest Weight Standard, which this Court is obviously well familiar with, and taking into consideration many of the factors I just alluded to, but which are set forth in my brief at pages 12, 13, there is substantial, substantial evidence that Ms. Schroeder's condition was accelerated and definitely aggravated by that accident, December 19, 2013. The Commission reversed the arbitrator under that. The arbitrator found she had a temporary aggravation. That's the go-to playbook, and rightfully so in this business, when a work comp carrier encounters somebody with a preexisting condition. But as I pointed out in my brief, the word temporary means what it is. It's not permanent. And I submit to you that if Ms. Schroeder, within three weeks, four weeks, if this condition had come back to where it was before, we wouldn't be here today. That's a temporary aggravation. This aggravation has never ended for Ms. Schroeder, and it never ended to the point that doing this surgery was necessitated. I believe that the Commission correctly rejected the arbitrator's finding in that fact. I believe there's sufficient evidence, such that I've outlined in here, that the manifest weight standard has been met, and the evidence is established that the Commission, in addition to weighing the medical evidence, which it was supposed to do, and it did, was also here to, also had the responsibility to assess the credibility of the witnesses, which it did. It found Ms. Schroeder credible. Swift is attacked for credibility for various reasons. Maybe some of them found it, some not. He certainly has the right to do that, but it's up to the Commission to assess the credibility, not myself or Mr. Coleman or any reviewing tribunals. So, lastly, I believe that in its brief, Ms. Swift did not even address the Corn Belt decision, which I think is so critical in this analysis, and once again, I would just ask that the decision of the Workers' Compensation Commission be confirmed. Thank you, counsel. Thank you. You'll have time in reply. Counsel, you may respond. May it please the Court? Mr. Smalling. Good morning, Your Honors. My name is Dwayne Coleman. I represent Swift Transportation in this case. And this case is extraordinary. And it's extraordinary because we know exactly what Nanette Schroeder's condition was prior to this accident. She went to the Neuroscience Group in her home in Nenon, Wisconsin. She had MRIs done. She had x-rays done. She was scheduled for fusion surgery. Dr. Yazback was attempting to do just that when Ms. Schroeder, to everybody's surprise, this is a woman who since 2010 is on social security disability for fibromyalgia, reapplies for work with Swift, for whom she hadn't worked for seven or eight years. And she does not accurately disclose everything. We're not attacking her credibility. She did that. That's a fact. She did not disclose she was seeing Dr. Yazback. She did not disclose her prior fusion surgery. She did not disclose that she had severe degenerative disc disease. Counsel, we know she had severe degenerative disc disease. The question is whether the accident advanced or aggravated it. Whether she was not a nice person for not telling you about it is really rather irrelevant. It does relate to her ability to get hired and ultimately drive, though. So what? I do agree with your point. But she was driving. And she was driving for over six months almost every day prior to the accident and subsequent to the accident she couldn't drive anymore. So the issue is, is there sufficient evidence in the record to support a finding that the accident aggravated or increased her prior condition? If the answer to that is yes, she can recover. If the answer to that is no, she can't. It's that easy. Understood. And I think the answer is a resounding no because when we look at her condition after the accident, again, she has an MRI done. Again, she has an X-ray done. These are being done by her doctor, Dr. Yazback, and ultimately her surgeon, Dr. Yazback. There are no changes. Not only are the radiological films the same, but her complaints of pain before and after the accident are the same. And then in April of 2014, when Dr. Yazback performs the fusion surgery at L5-S1 that he intended to do before she went off and reapplied for work and got hired, he fixes that. We see the radiological films on that. Her back has been repaired at that point in time. She still has the same complaints of pain. How can that possibly be? How could that possibly be related to her back? It's consistent before the accident, after the accident, after the fusion surgery. We submit that clearly all along her issues were primarily with her fibromyalgia, the very reason she was off work to begin with and receiving Social Security Disability benefits. That's why after Dr. Yazback does the surgery, she says she feels worse. But in any event, we can set that aside and we can say, just look at the back then. There's no proof submitted about fibromyalgia and whether that's the cause of the pain. We don't know. I submit that was Ms. Schroeder's burden. She presented zero evidence, none. Medical or even her own testimony. But looking just strictly at the medical, it's very clear based on the MRIs and the X-rays and her subjective complaints of pain, there were no change. I'd be happy to take on the Cornbell case because it has never been our position that the chain of events analysis is inapplicable as a matter of law in an instance where there's a preexisting disability. It is our position that you cannot apply that in a case like this for two reasons. One, there hasn't been a change before and after the accident. Secondly, and I think this is key, the test, if you look at it, talks about a disability that occurs after the accident. And so the disability before and after the accident is setting aside the fact that it's the same, but it's a degenerative condition. I think the nature of the injury is also important as to whether the chain of events analysis can be applicable. Because by definition, when you have a degenerative condition, it's going to get worse. So how do you separate whether somebody's worse after an accident, whether it's because of the accident or because of the degeneration of whatever, whether it's a knee, back, neck, whatever? We don't know. Well, doesn't that depend on what the experts say? It might if they can sort that out, Your Honor. Well, yes, they did sort it out. He opined that the accident aggravated the preexisting back condition. He did not address the fibromyalgia. And he explains what prompted us to move in a surgical direction. It made proceeding with surgery more appropriate, more viable. Prior to the accident, it was only conceivable that you would have need for surgery. I think it's what he said. I don't dispute that, Your Honor. However, what I would point out, though, is he had already decided to do surgery on her before the accident and was endeavoring to schedule that as well. So I think that the fact that afterwards she was willing to do it at that point in time, and she said she was beforehand, too. That's why they were trying to schedule it. But that's really her whim at that point in time more than the doctor's directive. They were trying to find this woman to schedule it. The record's very clear about that. But they couldn't find her to schedule that operation. So it never occurred. And then she reappears then in early 2014 after the accident. And they immediately proceed and do the workup on her. What are your complaints of pain? She's at an eight. What was she last time they saw her? She was at an eight. They do an MRI. They do an X-ray. No change. There's no objective difference. There's no subjective difference here. Now, one thing that I think is important to point out in this case is the commission's findings, too, are just flat wrong. They said that her treatment ended in March of 2013. That's not accurate. Dr. Yazback had just seen her. And Ms. Schroeder and Dr. Yazback had agreed surgery was going to be done, and it was being scheduled when she disappeared. Treatment was moving forward. It had not ended. She may have went off and started driving a truck, but she was still under his care at that point in time, and they were affirmatively trying to contact her to schedule that operation, that fusion surgery. And then secondly, I would submit, they took the chain of events test, and they modified it. They said, well, what it means is you have to be in a state of relative good health before the accident. Well, I'm not even sure what that means. I don't think it can apply. I think it becomes dysfunctional when you're dealing with a degenerative condition like Ms. Schroeder has. But that's just openly modifying Illinois law, and I think destroys any value, circumstantial value. So what do you say Illinois law is not relative good health? Well, I think my best answer to that question is that the test articulated by the Supreme Court 40 years ago now, where they said it's, make sure I get it right, they said it's a previous condition of good health. It doesn't have to be perfect, but it has to be good health. And I would submit it. You can have, for example, a knee injury. But if that injury is to the point where it's static, meaning it's not going to get worse, it's not degenerative, you can still apply the chain of events analysis. It would make sense there. However, I would say if the nature of the injury is degenerative and by definition is going to get worse, I don't think it works. In both the Corn Belt case and the case before it, I believe it was Pierce maybe, there was another case decided back in the mid-90s that also applied the chain of events test to preexisting injury. Neither of those cases involved a degenerative injury like we have here. So our view is, is that the commission when they... So you're saying chain of events analysis cannot be applied, should not be applied for an acceleration analysis? Not in a degenerative situation is correct. Why not? Why not? Because a much... A degenerative condition isn't going to cause paralysis for 10 years, but we have an accident that speeds it up and now we've got paralysis in two. Why not? In the absence of medical testimony, I don't think you can connect those dots. Well, we understand it has to be medical testimony, but Yazbeck gave it to you. Yazbeck opined that it did aggravate the preexisting condition. But he did... His own records indicate her condition was the same and her complaints were the same. That's why we point out... You can attack Yazbeck's opinion, but I don't think you can support the proposition that acceleration cannot be a basis for recovery merely because there's a degenerative condition. That doesn't follow. No, that's not what I'm saying. I'm saying we need to be very cautious about applying the chain of events analysis only to find compensability in that situation, Your Honor. Well, I thought you told us we couldn't use chain of events if it was a degenerative condition. No, I'm saying in the absence of medical testimony, I think just applying... And that's what was... If you just have chain of events testimony, that's not sufficient. Well, chain of events is just a logical proposition. Right. You've got one point at the beginning and you've got a point at the end. Right. And arguably, your argument is that both points are the same. Factually, they are in this case. But I'm also pointing out, setting that aside, I think there's a problem with applying the chain of events analysis where there's a deterioration in the condition such that a change later is not necessarily indicative of a work-related injury. I think that's a straightforward point. You always have to establish some nexus there. I'm sorry, Your Honor. You have to establish some nexus in the center. Well, sure. Of course. And that's the burden I would submit of the claimant. They have to show that there's an accident and that that accident made things worse in some fashion. And so your argument is they didn't do that because there's no worse. Her condition, oddly enough, although she had a degenerative condition, between when she saw Dr. Yes back in March of 2013 and then again in January of 2014, had not changed. The MRIs, the X-rays, they don't lie. And she too reported the same amount of pain, same symptoms. The surgery she had done, Your Honor, in April of 2014 was the very same surgery that was being planned and attempted to be scheduled for her back in April and May of 2013. So there couldn't have been an acceleration. That's absolutely right, under the records in Ms. Schroeder's own testimony. And again, we would submit that there truly is an 800-pound gorilla in this courtroom in this case, which is the fibromyalgia, which is, I don't know how else to explain, and none of the doctors have opined, but how she could have the complaints after having the fusion surgery, it could not have been her back at that point in time. And those complaints were the same consistent complaints as had existed all along. And that I would submit there's a potential another cause out there that has to be discounted, and it wasn't. That's a failure of proof in this case. And so therefore, I think Judge Lawrence of the Circuit Court got it exactly right, looking at the objective evidence, the subjective evidence, the objective evidence, and the evidence as a whole. Thank you, Your Honor. Thank you, Counsel. Counsel, you may reply. I don't know what Judge Lawrence did. I read his three-sentence order. It doesn't say anything. So I'm not sure what evidence he found in support of Mr. Coleman's position or why the chain of events theory was inapplicable. If I understand Mr. Coleman's argument, Ms. Schroeder is the exact same in July of 2013 as she is on December 25, 2013. Well, in July of 2013, she's driving trucks all over the U.S. December 25, 2013, she can't sleep. She can't sit. She can't stand. She's on narcotic pain medications. Next, she's getting a TENS unit. The surgery may not have alleviated all her symptoms, but it got her back to a point where Dr. Yazback released her return to work with a lifting restriction, so there was an improvement. The decision to have a surgery is oftentimes in the hands of the patient. Doctors will testify. My friend just had a quadruple bypass. He had no say about that surgery. It needed to save his life. However, knee replacement, shoulder replacement, they'll tell you when the quality of life gets to a point that the patient can't take it anymore, then they'll have the surgery. It's not life-threatening if you don't get your knee replaced. Well, in this case, Ms. Schroeder was fully capable of doing her job for SWIFT until this accident. It accelerated it. It aggravated it. Once again, I'm getting lost, and maybe it's just me, how this fibromyalgia enters into anything. You don't fuse somebody's spine to address a diagnosis of fibromyalgia. She was treating for it even during the time frame she was working. I go back to the Corn Belt, and I'm not going to beat that horse any better than it is. Thank you. Thank you, counsel, both for your arguments in this matter. It will be taken under advisement. A written disposition shall issue.